# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| NORTHROP GRUMMAN INNOVATION SYSTEMS, INC., | ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) ) | |
| ZURICH AMERICAN INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, CONTINETAL CASUALTY INSURANCE COMPANY, CAROLINA CASUALTY INSURANCE COMPANY, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, NATIONAL UNION FIRE COMPANY OF PITTSBURGH, PA, U.S. SPECIALTY INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, ALLIED WORLD ASSURANCE COMPANY, STARR INDEMNITY & LIABILITY COMPANY, XL SPECIALTY INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, QBE INSURANCE CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. N18C-09-210 PRW CCLD |
| *Defendants*. | ) ) | |

Submitted: January 7, 2021
Decided: February 2, 2021

*Upon Plaintiff Northrop Gruman Innovation Systems, Inc.'s Motion for*
*Judgment on the Pleadings*
**GRANTED**

*Upon Plaintiff Northrop Grumman Innovation Systems, Inc.'s Motion for Summary Judgment*
**GRANTED**

*Upon for Defendants Certain Underwriters at Lloyd's of London, Continental Casualty Company, and Carolina Casualty Insurance Company's Motion for Summary Judgment*
**GRANTED in part, DENIED in part**

*Upon Defendant National Union Fire Insurance Company of Pittsburgh, Pa.'s Motion for Summary Judgment*
**GRANTED in part, DENIED in part**

*Upon Defendants U.S. Specialty Insurance Company, Twin City Fire Insurance Company, and Allied World National Assurance Company's Motion for Summary Judgment*
**GRANTED in part, DENIED in part**

*Upon Defendants Travelers Surety and Casualty Company of America and Starr Indemnity & Liability Company's Motion for Summary Judgment*
**GRANTED in part, DENIED in part**

*Upon Defendants Berkley Insurance Company and QBE Insurance Corporation's Motion for Summary Judgment*
**DENIED**

## <u>MEMORANDUM OPINION AND ORDER</u>

David J. Baldwin, Esquire, Peter C. McGivney, Esquire, BERGER HARRIS LLP, Wilmington, Delaware; Barry J. Fleishman (*argued*), Esquire, Joseph D. Jean (*argued*), Esquire, Tamara D. Bruno, Esquire, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C., *Attorneys for Plaintiff Northrop Grumman Innovation Systems, Inc*.

Bruce W. McCullogh, Esquire, BODELL BOVÉ, LLC, Wilmington, Delaware; Wayne E. Borgeest, Esquire, Matthew I. Schiffhauer, Esquire, KAUFMAN BORGEEST & RYAN LLP, New York, New York, *Attorneys for Defendant Certain Underwriters at Lloyd's of London*.

Bruce W. McCullogh, Esquire, BODELL BOVÉ, LLC, Wilmington, Delaware; David F. Cutter (*argued*), Esquire, Jonathan R. Walton, Esquire, Emily R. Tripicchio, Esquire, BATESCAREY LLP, Chicago, Illinois; Karen Ventrell, Esquire, CNA COVERAGE LITIGATION GROUP, Washington, D.C., *Attorneys for Defendant Continental Casualty Company*.

Bruce W. McCullogh, Esquire, BODELL BOVÉ, LLC, Wilmington, Delaware; David F. Cutter (*argued*), Esquire, Jonathan R. Walton, Esquire, Emily R. Tripicchio, Esquire, BATESCAREY LLP, Chicago, Illinois, *Attorneys for Defendant Carolina Casualty Insurance Company*.

Robert J. Katzenstein, Esquire, Kathleen M. Miller, Esquire, SMITH KATZENSTEIN & JENKINS, LLP, Wilmington, Delaware; Michael L. Manire (*argued*), Esquire, Craig W. Kavanagh, Esquire, MANIRE GALLA CURLEY LLP, New York, New York, *Attorneys for Defendant Travelers Surety and Casualty Company of America*.

Timothy S. Martin, Esquire, WHITE AND WILLIAMS LLP, Wilmington, Delaware; Sean P. Mahoney (*argued*), Esquire, WHITE AND WILLIAMS LLP, Philadelphia, Pennsylvania, *Attorneys for Defendant National Union Fire Insurance Company of Pittsburgh, Pa*.

Robert J. Katzenstein, Esquire, SMITH KATZENSTEIN & JENKINS, LLP, Wilmington, Delaware; Joseph A. Bailey III, Esquire, M. Addison Draper (*argued*), Esquire, CLYDE & CO US LLP, Washington, D.C., *Attorneys for Defendant U.S. Specialty Insurance Company*.

Robert J. Katzenstein, Esquire, SMITH KATZENSTEIN & JENKINS, LLP, Wilmington, Delaware; Ronald P. Schiller, Esquire, Bonnie M. Hoffman, Esquire, Cary L. Rice, Esquire, HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, Philadelphia, Pennsylvania, *Attorneys for Defendant Twin City Fire Insurance Company*.

Eileen M. Ford, Esquire, MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C., Wilmington, Delaware; David H. Topol, Esquire, Matthew W. Beato, Esquire, WILEY REIN LLP, Washington, D.C., *Attorneys for Defendant Allied World National Assurance Company*.

Barry M. Klayman, Esquire, COZEN O'CONNOR, Wilmington, Delaware; Michael R. Davisson (*argued*), Esquire, COZEN O'CONNOR, Los Angeles, California, *Attorneys for Defendant Starr Indemnity & Liability Company*.

John C. Phillips, Jr., Esquire, David A. Bilson, Esquire, PHILLIPS MCLAUGHLIN & HALL, P.A., Wilmington, Delaware; Geoffrey W. Heineman, Esquire, Jung H. Park (*argued*), Esquire, ROPERS MAJESKI KOHN & BENTLEY, P.C., New York, New York, *Attorneys for Defendant Berkley Insurance Company*.

David C. Malatesta, Esquire, KENT & MCBRIDE, P.C., Wilmington, Delaware; David A. Wilford, Esquire, Anthony J. D'Agostino (*argued*), Esquire, WILFORD CONRAD LLP, Barrington, Illinois, *Attorneys for Defendant QBE Insurance Corporation*.

**WALLACE, J.**

This sprawling insurance coverage dispute involves one transaction, two alleged federal securities law violations, three policy towers, seven motions, and a baker's dozen parties. Northrop Grumman Innovation Systems, Inc. ("Northrop") asserts its insurance companies have wrongfully denied it coverage for defense fees and settlement costs incurred from a class action lawsuit (the "*Knurr* Litigation") challenging proxy solicitation statements (the "14(a) Claim") about the merger of Alliant Techsystems, Inc. ("Alliant") and Orbital Sciences Corporation ("Orbital Sciences") and post-closing financial reports (the "10(b) Claim") about the value of the resulting entity—Orbital ATK, Inc. ("OATK").

Resolution of the parties' dueling and cross-dispositive motions requires the Court to address Delaware and Virginia contract principles, corporate law, insurance definitions, provisions and exclusions, and payment allocation and exhaustion. Many of these issues are purely legal and will be decided now. A jury will have to handle the rest.

Northrop moves under Rule 12(c) against Berkley Insurance Company and QBE Insurance Corporation (collectively, the "OATK Insurers") to knock out those insurers' resistance to the 10(b) Claim's coverage via the "Prior Acts Exclusion." That Exclusion precludes coverage for intertwined misconduct engaged by OATK prior to the policy period. The OATK Insurers respond with their own summary judgment motion asking the Court to hold, as a matter of law, that the Prior Acts

Exclusion applies, certain investigatory fees are not covered, and that they are liable only for a specific distribution of loss.

Next, Continental Casualty, Carolina Casualty, and Certain Underwriters at Lloyd's of London (collectively, the "Orbital Sciences Insurers") move for summary judgment against Northrop, contending that: (1) Northrop failed to give them timely notice of the *Knurr* Litigation; and (2) neither the 10(b) nor 14(a) Claim is covered.

Finally, Northrop moves for summary judgment against National Union, U.S. Specialty, Twin City, Allied World, Starr, and Travelers (collectively, the "Alliant Insurers"), contending that the 14(a) Claim's coverage is not barred by the so-called "Bump Up Provision." That "Provision"—which looks an awful lot like an exclusion—carves out indemnity for losses that "effectively increase" "inadequate consideration" given for the "acquisition of all or substantially all the ownership interests or assets of an entity." This is where things will later get a bit complicated. Together, the Alliant Insurers cross-move for summary judgment and ask the Court to hold, as a matter of law, that coverage is unavailable for both the 14(a) and 10(b) Claims and certain defense costs. And separately (though relatedly), all of the Alliant Insurers but National Union (collectively—where relevant—the "Excess Alliant Insurers") say Northrop's allocation and exhaustion doesn't add up.

Applying well-settled Delaware law, the Court holds the following and, thereafter discusses in some detail the reasons for those rulings.

*First*, the OATK Insurers (1) must cover the 10(b) Claim; (2) have not met their burden to show there is no genuine issue of material fact about Northrop's investigatory fees; and (3) are not entitled to a conclusive allocation or exhaustion ruling. Accordingly, Northrop's motion for judgment on the pleadings is **GRANTED** and the OATK Insurers' summary judgment motion is **DENIED**.

*Second*, the Orbital Sciences Insurers (1) have not met their burden to show there is no genuine issue of material fact about the reasonableness of and prejudice caused by Northrop's notice; (2) need not cover the 10(b) Claim; but (3) have not met their burden to show their policies provide no coverage for the 14(a) Claim and associated defense costs as a matter of law. Accordingly, the Orbital Sciences Insurers' summary judgment motion is **GRANTED in part, and DENIED in part**.

*Third*, the Alliant Insurers (1) must cover the 14(a) Claim; but (2) need not cover the 10(b) Claim; and (3) have not met their burden to show there is no genuine issue of material fact about coverage for Northrop's investigatory fees and defense costs. To the extent the Excess Alliant Insurers moved separately on exhaustion and allocation, they also have not met their summary judgment burdens. Accordingly, Northrop's summary judgment motion is **GRANTED** and all of the Alliant Insurers' summary judgment motions are **GRANTED in part, and DENIED in part**.

# I. FACTUAL BACKGROUND

The parties have amassed an immense amount of discovery. This being so, they have crafted various competing iterations of what appear to be facts of interest in this and the underlying litigation. But the Court confines itself here to those which the parties agree are central to their instant motions.

## A. THE OATK POLICIES.

The OATK Insurers issued excess directors' and officers' ("D&O") liability coverage to OATK and its management that encompasses the April 15, 2016 to April 15, 2017 period (the "OATK Policies").[1] The OATK Policies cover "Loss" incurred by an insured "Organization" arising from any "Claim," including "Securities Claims," brought against an "Insured Person" for a "Wrongful Act." "Loss" is defined to include settlements.[2] "Organization" is defined as OATK and its subsidiaries.[3] "Claim" is defined as a "civil action for monetary relief."[4] "Securities Claim" is defined to include Claims alleging violations of the federal securities

---

[1] Northrop Amended Complaint ¶¶ 104-05 (D.I. 36) ("Northrop Compl."); Exhibit B (D.I. 132) ("OATK Policies").

[2] OATK Policies §§ 1, 13.

[3] *Id.* § 13.

[4] *Id.*

laws.[5] "Insured Person" includes OATK executives.[6] "Wrongful Act" is defined to include "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by an Organization . . . solely in regard to a Securities Claim."[7] And "Defense Costs" is defined to include "reasonable fees, costs and expenses [incurred from] the investigation . . . of a Claim."[8]

The OATK Policies also contain an exclusion relieving the OATK Insurers of their duty to indemnify "Prior Acts."[9] Under the OATK Policies, the Insurers "shall not be liable to make any payment for Loss in connection with any Claim made against [OATK and its management] occurring prior to February 9, 2015. . . . Loss arising out of the same or related Wrongful Act shall be deemed to arise from the first such same or related Wrongful Act."[10] Stated less esoterically, the Prior Acts Exclusion strips coverage from an otherwise covered Wrongful Act if the latter is infected by a Wrongful Act that occurred before the coverage period commenced.

---

[5]    *Id.*

[6]    *Id.*

[7]    *Id.*

[8]    *Id.*

[9]    *Id.* Endorsement #39.

[10]    *Id.*

## B. THE ALLIANT POLICIES.

Alliant purchased primary and excess D&O liability policies from the Alliant Insurers covering the March 1, 2014 to March 1, 2015 period with an extended six-year run-off period thereafter (the "Alliant Policies").[11] The Alliant Policies indemnify "Loss" incurred by an "Organization" arising from a "Securities Claim" brought against an "Insured Person" for any "Wrongful Act."[12] Loss is defined to include damages and settlements.[13] Organization is defined to include Alliant.[14] Insured Person is defined to include an "Executive," which, in turn, is defined as "any past, present or future" director or officer of Alliant.[15] A Wrongful Act may be committed by an Executive and is defined as "any actual or alleged breach of a duty, error, neglect, misstatement, misleading statement, omission or act . . . by such an Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such."[16] And a Securities Claim is defined to include a suit alleging violations of the federal securities laws.[17]

---

[11] *See generally* Exhibit A of Alliant Insurers' Joint Appendix (D.I. 519) ("Alliant Policies").

[12] Alliant Policies §§ 1(B), 13.

[13] *Id.* § 13.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* Endorsement #14.

The Alliant Policies were subsequently redrafted to capture more persons, entities and costs. Alliant negotiated an endorsement that added two Orbital Sciences executives (David Thompson and Garrett Pierce) to coverage as Insured Persons along with Alliant Executive Mark DeYoung.[18] The "Capacity" in which Thompson and Pierce were added is described this way: for "[c]ertification of [OATK f/k/a Alliant's] SEC Form No. 10K and 10Q filings as required by the Sarbanes-Oxley Act of 2002 and provided in connection with the merger agreement [or its plan] or similarly titled contract executed by and between [Alliant and Orbital Sciences]."[19] Too, Alliant purchased an endorsement to extend coverage to "Successor Entities," including OATK.[20] And the Alliant Policies' "Defense Costs" definition was expanded in the Securities Claims context to cover those "(i) jointly incurred by, . . . [OATK and Insured Persons]."[21]

The Alliant Policies contain a carve-out from the definition of Loss for certain types of Loss incurred from Securities Claims: the so-called "Bump Up Provision."

---

[18] *Id.* Endorsement #45.

[19] *Id.*

[20] *Id.* Endorsement #49.

[21] *Id.* Endorsement #32 § 9(D). "Defense Costs" otherwise has the same meaning here as it does in the OATK Policies. *See* OATK Policies, *supra* note 8 & accompanying text.

It declares –

> In the event of a Claim alleging that the price or consideration paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest or assets in an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price is effectively increased. . .; provided, however, that this paragraph shall not apply to Defense Costs or to any Non-Indemnifiable Loss in connection therewith.[22]

The Alliant Policies also grant coverage for "Wrongful Acts" that occur outside the Policies' period but are "Interrelated" with those that occur within it.[23]

## C. THE ORBITAL SCIENCES POLICIES.

Orbital Sciences purchased primary and excess D&O liability insurance from the Orbital Sciences Insurers covering the July 1, 2014 to February 9, 2015 period with a six-year run-off period thereafter (the "Orbital Sciences Policies").[24]  Their definitions are substantially similar to the Alliant Policies' outlined above.   They also expand coverage for "Interrelated Wrongful Acts" in the same way the Alliant Policies do.[25]

---

[22] *Id.* § 13.

[23] *See, e.g.*, *id.* Endorsement #49.

[24] Northrop Compl. ¶ 32.

[25] Orbital Sciences Policies, Endorsement #36.

Some permutations exist, however. The Orbital Sciences Policies contain an endorsement providing coverage to "Successors-in-Interest." That endorsement states: "[C]overage . . . for Claims made against any Insured shall extend to the Buyer, Buyer's Acquisition Company and its Insured Persons solely in their capacity as the successor to the Policyholder."[26] Buyer is defined as Alliant.[27] Buyer's Acquisition Company is defined as Vista Merger Sub, Inc. (*i.e.*, the special purpose vehicle used to facilitate the merger).[28] Insured Person is defined to include Orbital Sciences executives.[29] And Policyholder is defined as Orbital Sciences.[30]

Additionally, the Orbital Sciences Policies condition coverage on written notice. In its own language –

> As a condition precedent to their rights under this policy, the Insureds shall give the Underwriter written notice of any Claim made against the Insureds as soon as practicable after the Company's risk manager or general counsel first learns of such Claim, but in no event later than (i) ninety (90) days after expiration of the Policy Period or (ii) expiration of the Extended Reporting Period or Run-Off Coverage Period, if exercised.[31]

---

[26]  Exhibit 9, Endorsement #36 (D.I. 668) ("Orbital Sciences Policies").

[27]  *Id.* § 3 & Endorsement #36.

[28]  *Id.*

[29]  *Id.*

[30]  *Id.*

[31]  *Id.* Endorsement #18.

Company is defined to include Orbital Sciences and its subsidiaries.[32]

## D. THE TRANSACTION.

On April 29, 2014, Alliant and Orbital Sciences—two firms supplying the aerospace and national defense industries—proposed a reverse triangular stock-for-stock merger out of which OATK would be born.[33] Their stockholders received proxy forms and other disclosures and ultimately approved. The transaction closed on February 9, 2015,[34] and went like this.

After spinning out its sporting goods arm, Alliant formed a wholly-owned special purpose vehicle and merged it with Orbital Sciences.[35] Orbital Sciences survived.[36] Orbital Sciences's stock was converted into a right to receive Alliant stock—an option that approving stockholders exercised.[37] Alliant issued a few

---

[32] Affidavit, Exhibit 1 at pdf. p. 21 (D.I. 482).

[33] Exhibit B, Knurr Amended Complaint, *Knurr v. Orbital ATK, Inc.*, C.A. No. 1:16-CV-01031-TSE-MSN (E.D. Va. Oct. 10, 2017), ECF No. 78, ¶¶ 49-55 (D.I. 346) ("*Knurr* Compl."). In a generic reverse triangular merger, the target merges with the acquirer's subsidiary, with the target surviving. The economic effect is that the target becomes a subsidiary of the acquirer "as if" the acquirer purchased all of the target's outstanding stock. As here, the target's stock may then be converted into the right to receive stock in the acquirer. Once that option is exercised, the target's stockholders exchange ownership in the target to become owners of the acquirer. *W. Standard, LLC v. Sourcehov Holdings, Inc.*, 2019 WL 3322406, at *6 (Del. Ch. July 24, 2019) (citing *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 63 (Del. Ch. 2013)).

[34] *Knurr* Compl. ¶¶ 49-55.

[35] *Id.*

[36] *Id.*

[37] *Id.* Orbital Sciences stockholders also received cash for any fractional residual.

million shares to consummate the exchange. That primary offering and the swap linked to it diluted pre-existing control of Alliant and created an ownership split comprising a 53.8% stake for Alliant stockholders and a 46.2% stake for Orbital Sciences stockholders.[38]

Alliant then was renamed OATK and the former's stock cancelled and converted accordingly.[39] OATK absorbed Alliant's portfolio, but not Orbital Sciences's.[40] Based on the deal's structure, commingling was avoided (1) to minimize unwanted taxation (the merger vehicle was the "buyer"); and (2) to complement OATK's aerospace and defense assets that were located in an unspun subsidiary sitting on the same organizational branch. On the management side, Thompson and Pierce became OATK executives and DeYoung became one of its directors. They conducted business from Orbital Sciences's old headquarters.[41]

### E. THE *KNURR* LITIGATION.

Though the firms celebrated the lift off, their investors radioed a problem. A class of OATK stockholders brought the *Knurr* Litigation against OATK, DeYoung,

---

[38]  *Id.*

[39]  *Id.*

[40]  *Id.*

[41]  *Id.*

Thompson and Pierce under Section 10(b) of the Securities Exchange Act.[42]  In the 10(b) Claim, the class alleged that OATK and the managers intentionally disseminated false, post-merger data about OATK's financial health to mislead securities holders about the value of their investments.[43]

Sensing further wrongdoing, a class of former Orbital Sciences stockholders added a violation of Securities Exchange Act Section 14(a) to the fray.  They targeted DeYoung, Thompson, and Pierce, in their former roles, and OATK.[44]  They alleged the control groups pronounced false or misleading statements in the proxy solicitation materials and other filings distributed and certified in advance of the transaction.[45]  At its core, the 14(a) Claim's accusations declared a coerced vote, as the misinformed stockholders decried OATK and the managers: (1) misrepresented Alliant's net value; (2) omitted Alliant's most detrimental liabilities, including an underperforming government contract (the "Lake City Contract"); (3) omitted flaws in Alliant's operations; and (4) oversold the near-half OATK split, which, due to then-concealed, highly-leveraged assets, was actually less financially advantageous

---

[42]  *Id.* ¶¶ 160-230, 249.

[43]  *Id.* ¶¶ 64-122.

[44]  *Id.* ¶ 258.  The *Knurr* class did not explain precisely in what capacity OATK was liable for misconduct engaged before it existed.

[45]  *Id.* ¶¶ 1, 15, 258-301.

than the boards suggested.[46] According to the Orbital Sciences stockholders, "[t]he false and misleading statements . . . caused Alliant to be overvalued and impacted the [OATK ownership split]," which, in turn, deprived them "of their right to a fully informed vote and induc[ed] them to vote their shares and accept inadequate consideration."[47]

The *Knurr* class sought joint and several "compensatory damages" for both Claims.[48] In due course, the defendants settled the Claims for approximately $62.4 million (10(b)) and $45.6 million (14(a)).[49] No defendant admitted wrongdoing.[50]

## F. THE PRESENT COVERAGE DISPUTE.

Northrop, which later acquired OATK, noticed the Insurers of all three Policies for settlement and defense coverage. But the Insurers largely declined for one reason or another.[51] Pertinent to their denials and instant motions are the following reasons why, in the Insurers' views, they owed Northrop little to nothing in reimbursement. The Alliant Insurers felt that the 14(a) Claim was a forbidden

---

[46] *Id.* ¶¶ 258, 260, 268, 290, 292, 303-308, 311-14.

[47] *Id.* ¶ 260.

[48] *See generally id.* Prayer for Relief.

[49] *See* Exhibit A-1, Proposed Settlement, *Knurr v. Orbital ATK, Inc.*, C.A. No. 1:16-CV-01031-TSE-MSN (E.D. Va. Jan. 30, 2019), ECF No. 439-1, at pdf. pp. 48-50, 63.

[50] *Id.* at 63.

[51] Northrop Compl. ¶¶ 143-59. Zurich and Northrop reached a confidential settlement.

"Bump Up" Claim. The Orbital Sciences Insurers thought all coverage was barred due to untimely notice. And the OATK Insurers opined that the 10(b) Claim was related to a pre-Policy Wrongful Act.

Left in the lurch, Northrop sued. It now brings breach-of-contract claims and requests coverage declarations.[52]

At this stage, the parties seek to cull the herd of issues with a volley of dueling and cross-dispositive motions. Northrop moves under Rule 12(c) (against the OATK Insurers) and Rule 56 (against the Alliant Insurers) to establish coverage for the 14(a) and 10(b) Claims under one or more policies. All Insurers bring their own Rule 56 motions to withhold coverage on the same bases Northrop seeks it. Each also raises challenges not presented in Northrop's motions but to which Northrop nevertheless has responded. Last month, the Court heard argument on the motions and they are all now ripe for decision.[53]

The issues before the Court are segregable by policy. Indeed, some of the Insurers are territorial enough to err procedurally in getting their points across.[54]

---

[52] *Id.* ¶¶ 160-89.

[53] *See* Transcript (D.I. 722) ("Or. Arg. Tr.").

[54] *See* OATK Insurers' "Reply" Briefs (D.I. 660, 661) (arguing against the Alliant and Orbital Sciences' Insurers without filing a crossclaim or otherwise creating adversity among co-defendants as required by Del. Super. Ct. Civ. R. 56(c)). To be clear, these briefs were not considered.

-14-

And so, the Court attempts to terminate—or, at least, impose a temporary ceasefire in—the warfare waged within each tower on a tower-by-tower basis.

With respect to the OATK Policies, Northrop's 12(c) motion[55] and the OATK Insurers' Rule 56 motion[56] present the following questions. Does Delaware or Virginia law apply to the Policies' interpretations? Do the Policies exclude coverage for the 10(b) Claim either by definition or through the Prior Acts Exclusion? Are certain fees Policy-defined Defense Costs? And, can or should allocation and exhaustion be resolved before liability is determined?

With respect to the Orbital Sciences Policies, the Orbital Sciences Insurers' Rule 56 motion[57] presents the following questions. Does Delaware or Virginia law apply to the Policies' interpretations—including the notice-based condition? Do the Policies cover the 10(b) Claim as an "Interrelated Wrongful Act"? Is OATK a "successor" to Orbital Sciences for the purposes of the 14(a) Claim's coverage? And, were certain executive liabilities indemnified?

Finally, with respect to the Alliant Policies, Northrop's[58] and the (Excess)[59]

---

[55] D.I. 345.

[56] D.I. 475 ("OATK Insurers Op. Br.").

[57] D.I. 538 ("Orbital Sciences Insurers Op. Br.").

[58] D.I. 543.

[59] D.I. 483 (U.S. Specialty, Twin City and Allied World), D.I. 539 (Starr & Travelers).

Alliant Insurers'[60] dueling and cross Rule 56 motions present the following questions. Do the Policies cover the 10(b) Claim as an "Interrelated Wrongful Act"? Does the Bump Up "Provision" bar coverage for the 14(a) Claim? Do certain fees count as Policy-defined Defense Costs? And, can or should allocation and exhaustion be resolved before liability is determined?

## II. STANDARDS OF REVIEW

### A. JUDGMENT ON THE PLEADINGS.

A party may move for judgment on the pleadings under this Court's Civil Rule 12(c).[61] "In determining a Rule 12(c) motion, the Court is required to view the facts pleaded and the inferences to be drawn from such facts in the light most favorable to the non-moving party."[62] The Court "must take the well-pleaded facts alleged in the complaint as admitted."[63] The Court "also assumes the truthfulness of all well-pled allegations of fact in the complaint."[64] And the Court "accords a party opposing

---

[60] D.I. 518 ("National Union Op. Br.").

[61] Del. Super. Ct. Civ. R. 12(c).

[62] *Indian Harbor Ins. Co. v. SharkNinja Operating LLC*, 2020 WL 6795965, at *2 (Del. Super. Ct. Nov. 19, 2020) (citing *Catlin Specialty Ins. Co. v. CBL & Assocs. Props., Inc.*, 2017 WL 4784432, at *6 (Del. Super. Ct. Sept. 20, 2017)) (internal quotation marks omitted) (applying Delaware procedural law).

[63] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) (citations omitted).

[64] *CBL & Assocs.*, 2017 WL 4784432, at *6.

a Rule 12(c) motion the same benefits as a party defending a motion under Rule 12(b)(6)."[65] As a result, the Court may grant a motion for judgment on the pleadings only "when viewing the facts alleged in the pleadings and the reasonable inferences to be drawn in favor of the non-moving party, no material issue of fact exists and the movant is entitled to judgment as a matter of law."[66]

## B. SUMMARY JUDGMENT.

The Court "cannot grant any party's motion for summary judgment under Delaware Superior Court Civil Rule 56 unless no genuine issue of material fact exists and that party is entitled to judgment as a matter of law."[67] Summary judgment will not be granted "if there is a material fact in dispute"[68] or if "it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances."[69] The burden is on the moving party to demonstrate its claim is

---

[65] *Id.*; *see SharkNinja*, 2020 WL 6795965, at \*2 ("The standard for a motion for judgment on the pleadings is almost identical to the standard for a motion to dismiss under Rule 12(b)(6)." (citing *Silver Lake Off. Plaza, LLC v. Lanard & Axilbund, Inc.,* 2014 WL 595378, at \*6 (Del. Super. Ct. Jan. 17, 2014) (internal quotation marks omitted))).

[66] *V&M Aerospace LLC v. V&M Co.*, 2019 WL 3238920, at \*3 (Del. Super. Ct. July 18, 2019) (citations omitted).

[67] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at \*5 (Del. Super. Ct. Jan. 31, 2019) (citing Del. Super. Ct. Civ. R. 56).

[68] *IDT Corp.*, 2019 WL 413692, at \*5; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *In re Asbestos Litig.*, 2006 WL 3492370, at \*3 (Del. Super. Ct. Nov. 28, 2006).

[69] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962); *CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at \*1 (Del. Super. Ct. June 8, 2015) (observing summary

supported by undisputed facts.[70]  If that burden is met, then the non-moving party must show "there is a genuine issue for trial."[71]  And in determining whether there is, the Court views the facts in the light most favorable to the non-moving party.[72]

"These well-established standards and rules equally apply [to the extent] the parties have filed cross-motions for summary judgment."[73]  Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[74]  But where cross-motions for summary judgment are filed and an issue

---

judgment is improper "if . . . the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record. . . ."); *Pathmark Stores, Inc. v. 3821 Assocs., L.P.*, 663 A.2d 1189, 1191 (Del. Ch. 1995) ("[S]ummary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[70]  *See Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[71]  Del. Super. Ct. Civ. R. 56(e); *see CNH Indus. Am. LLC,* 2015 WL 3863225, at *1 ("If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder."); *but see Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999) ("[A] matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary.").

[72]  *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977) ("The facts must be viewed in the manner most favorable to the nonmoving party . . . with all factual inferences taken against the moving party and in favor of the nonmoving party.").

[73]  *IDT Corp.*, 2019 WL 413692, at *5 (citations omitted); *see Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. Ct. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. Ct. 2001)).

[74]  Del. Super. Ct. Civ. R. 56(h).

of material fact exists, summary judgment is not appropriate.[75]  To determine whether there is a genuine issue of material fact, the Court evaluates each motion independently.[76]  And again, where it seems prudent to make a more thorough inquiry into the facts, summary judgment will be denied.[77]

## III. DISCUSSION

### A. THE OATK POLICIES COVER THE 10(b) CLAIM AND SUMMARY JUDGMENT ISN'T WARRANTED ON NORTHROP'S DEFENSE COSTS.

#### 1. Delaware Law Applies to the Construction of the OATK Policies.

The OATK Insurers suggest a conflict between Delaware and Virginia law on the 10(b) Claim's coverage.  The Court, therefore, begins with a Delaware choice-of-law analysis—the governing framework when Delaware is the forum state.[78]

"There are three steps to take when engaging Delaware's choice-of-law

---

[75]  *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. Ct. June 19, 2017), *aff'd sub nom., Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.,* 191 A.3d 1109 (Del. 2018); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008); *see also Anolick v. Holy Trinity Greek Orthodox Church, Inc.*, 787 A.2d 732, 738 (Del. Ch. 2001) ("[T]he presence of cross-motions 'does not act *per se* as a concession that there is an absence of factual issues.'" (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.,* 693 A.2d 1076, 1079 (Del. 1997))).

[76]  *Motors Liquidation*, 2017 WL 2495417, at *5; *see Fasciana v. Elec. Data Sys. Corp.,* 829 A.2d 160, 167 (Del. Ch. 2003).

[77]  *Ebersole*, 180 A.2d at 470-72; *Pathmark Stores*, 663 A.2d at 1191.

[78]  *See, e.g.*, *Shook & Fletcher Asbestos Settlement Tr. v. Safety Nat'l Cas. Corp.*, 2005 WL 2436193, at *2 (Del. Super. Ct. Sept. 29, 2005), *aff'd*, 909 A.2d 125 (Del. 2006).

analysis[.]"[79]  Ordinarily, the Court must determine first whether "the parties made an effective choice of law through their contract[.]"[80]  Here, however, the OATK Policies express no choice of law.  The Court, then, must treat step two as step one and determine whether "there is an actual conflict between the laws of the different states each party believes should apply[.]"[81]  The word "actual" is key.  If the conflict a party advances is "merely a false . . . conflict," then there is no choice-of-law analysis to undertake and Delaware law applies.[82]  Too, if the alternate state's law fails "to address [the] particular issue," then it cannot conflict with Delaware law and the Court applies "settled [Delaware] law."[83]  Only after the Court finds an "actual" conflict will it proceed to step three: use of the "'most significant relationship test' to determine which state's law applies."[84]

---

[79]  *Pfizer Inc. v. Arch Ins. Co.*, 2019 WL 3306043, at *6 (Del. Super. Ct. July 23, 2019).

[80]  *Id.* (citing *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017)); *accord Travelers Indem. Co. v. CNH Indus. Am., LLC*, 2018 WL 3434562, at *3 (Del. July 16, 2018).

[81]  *Pfizer*, 2019 WL 3306043, at *6 (citing *Chemtura*, 160 A.3d at 464).

[82]  *Laguelle v. Bell Helicopter Textron, Inc.*, 2013 WL 5460164, at *2 (Del. Super. Ct. Oct. 1, 2013) (internal quotation marks omitted); *see Gallup, Inc. v. Greenwich Ins. Co.*, 2015 WL 1201518, at *8-9 (Del. Super. Ct. Feb. 25, 2015) (declining to engage choice-of-law analysis because defendant asserted a false conflict between Delaware and Nebraska law).

[83]  *Arch Ins. Co. v. Murdock*, 2018 WL 1129110, at *8 (Del. Super. Ct. Mar. 1, 2018) (citing *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at *4 (Del. Super. Ct. Nov. 5, 2010)); *see Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010).

[84]  *Pfizer*, 2019 WL 3306043, at *6 (citing *Chemtura*, 160 A.3d at 464).

### a. Delaware and Virginia Law are Not in Conflict.

The OATK Insurers acknowledge that both Delaware and Virginia courts employ plain meaning tools when interpreting insurance agreements.[85] Nevertheless, they say the two states diverge on the term "related" in the Prior Acts Exclusion. According to the OATK Insurers, Virginia courts construe "related" to mean "connected in some way," which is more relaxed than Delaware's "fundamentally identical" standard for judging relatedness.

Try as they may, the OATK Insurers simply cannot instigate a true "conflict" between Delaware and Virginia on this point of law. When pressed, the OATK Insurers concede that there is no Virginia connected-in-some-way standard.[86] Indeed, they merely speculate as to how a Virginia court *might* define "related" if given the chance.[87] But Delaware courts don't provoke an actual-conflict analysis on hypotheticals or guesswork.[88] We instead invoke "settled law."[89] Here,

---

[85] OATK Insurers Op. Br. at 33-34.

[86] *See* Or. Arg. Tr. at 64 ("[OATK Insurers' Counsel]: Your Honor, . . . we weren't able to find any Virginia case that actually interprets the words relatable acts. . . .").

[87] *See* OATK Insurers Op. Br. at 33-34 (failing to cite a Virginia case adopting a connected-in-some-way standard and resorting to decisions from around the country).

[88] *See Mills*, 2010 WL 8250837, at *4 (rejecting defendant's actual conflict argument on grounds that it required a prediction about how the alternate forum would rule).

[89] *Murdock*, 2018 WL 1129110, at *8 (citations omitted); *see Deuley*, 8 A.3d at 1161.

Delaware's "fundamentally identical" test is settled law on relatedness.[90] Accordingly, the conflict is false. Delaware contract law controls both generally and the Prior Acts Exclusion.

### b. Delaware Plain Meaning Analysis Applies Generally.

"Insurance policies are contracts."[91] And "[u]nder Delaware law, the interpretation of contractual language, including that of insurance policies, is a question of law."[92] The objective of interpretation is to give effect to the parties' mutual intent at the time of contracting.[93] So, in construing insurance terms, the Court interprets the policy in a manner intelligible to objectively reasonable minds.[94] Absent ambiguity, all contract terms—including those in insurance policies—are accorded their plain, ordinary meaning.[95] A term is not ambiguous merely because the parties say it is.[96] Ambiguity exists only when the disputed term "is fairly or

---

[90] *See, e.g.*, *Pfizer*, 2019 WL 3306043, at *9 (discussing and applying this standard).

[91] *IDT Corp.*, 2019 WL 413692, at *7 (citation omitted).

[92] *O'Brien v. Progressive N. Ins. Co.,* 785 A.2d 281, 286 (Del. 2001); *see Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018) ("Whether [a] contract's material terms are sufficiently definite [is] mostly, if not entirely, a question of law." (citation omitted)); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1263 (Del. 2017) (same).

[93] *Exelon*, 176 A.3d at 1263.

[94] *See Med. Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879, at *7 (Del. Super. Ct. Sept. 29, 2016); *see also Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014).

[95] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[96] *Id.*

reasonably susceptible to more than one meaning."[97]   And a truly ambiguous insurance contract will be construed most strongly against the insurer and in favor of the insured.[98]

Too, in the insurance context, coverage language is construed broadly "to protect the insured's objectively reasonable expectations."[99] Exclusionary language, however, is construed narrowly and strictly.[100]   Accordingly, Delaware courts will not enforce an exclusion unless it is "specific, clear, plain, conspicuous and not contrary to public policy."[101]   And that is so even when exclusionary language is unambiguous.[102] Otherwise, diversification afforded sophisticated counterparties by corporate-wide insurance programs may be forfeited and exposure to risk potentially unlimited.[103]   As a result, the insurer bears the burden of demonstrating

---

[97]   *Id.*; *see Urdan v. WR Cap. Partners, LLC*, 2020 WL 7223313, at *6 n.17 (Del. Dec. 8, 2020) ("Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it." (internal quotation marks omitted)).

[98]   *See Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 2020 WL 363677, at *4 (Del. Super. Ct. Jan. 21, 2020), *appeal denied*, 2020 WL 764155 (Del. Feb. 17, 2020).

[99]   *Med. Depot*, 2016 WL 5539879, at *7 (citations omitted).

[100]   *Id.* (internal quotation marks omitted).

[101]   *Pfizer*, 2019 WL 3306043, at *9 (internal quotation marks omitted).

[102]   *See Med. Depot*, 2016 WL 5539879, at *7 (citing *AT&T Corp. v. Clarendon Am. Ins. Co.*, 2006 WL 1382268, at *9 & n.123 (Del. Super. Ct. Apr. 25, 2006), *rev'd on other grounds sub nom.*, *AT&T Corp. v. Faraday Cap. Ltd.*, 918 A.2d 1104 (Del. 2007)).

[103]   *See Med. Depot*, 2016 WL 5539879, at *11 ("Delaware law abhors forfeiture where to do so would deny the insured the very thing paid for." (citing *State Farm Mut. Auto. Ins. Co. v. Johnson*, 320 A.2d 345, 347 (Del. 1974))).

an exclusion precludes coverage the insured reasonably expected.[104]

### 2. The 10(b) Claim is Covered.

#### a. *The OATK Policies Concern OATK's Prior Acts Only.*

The OATK Insurers argue the Prior Acts Exclusion bars coverage for the 10(b) Claim because it is related to the 14(a) Claim that occurred before the Policies' period. But in order for the Prior Acts Exclusion to apply, the "Wrongful Act" must be taken by the Policy-defined insured.[105] Plainly, the OATK Policies define "Organization" and "Insured Persons" to include OATK and its management.[106] They do not define those terms to include Alliant or Orbital Sciences. The 14(a) Claim, though, was brought against Alliant and Orbital Sciences personnel in their capacities as directors and executives of those firms.[107] It was not brought against OATK *qua* OATK or the managers in their roles at OATK. It couldn't have been. The 14(a) Claim alleges wrongdoing engaged before OATK was created.[108] The 10(b) Claim, in contrast, alleged wrongdoing by OATK and its management

---

[104] *See Gallup*, 2015 WL 1201518, at *9 (citations omitted).

[105] *See Ferrellgas*, 2020 WL 363677, at *11-13 (analyzing similar exclusion by looking to the definitions in the subject policy); OATK Policies, Endorsement #39.

[106] OATK Policies § 13.

[107] *See, e.g.*, *Knurr* Compl. ¶¶ 258, 260, 268, 290, 292, 303-308, 311-14.

[108] *Id.*

squarely within the Policies' period and purpose.[109]  Unambiguously, then, the Prior Acts Exclusion does not reach the 14(a) Claim.  Accordingly, coverage for the 10(b) Claim is unaffected by the 14(a) Claim.

To avoid this straightforward result, the OATK Insurers mouth a few meritless arguments.  They start by urging the Court to examine every Policy but their own.[110]  No need.  When policy language, like theirs, is plain, the Court doesn't look elsewhere to divine its meaning.[111]

Next, they say OATK and Alliant really are the same firm because Alliant merely changed its name to OATK as part of the transaction.  But these Policies unambiguously were issued to OATK—a legally distinct entity, regardless of the effect a name change might have—and don't use the word "Alliant" at all.[112]  So, narrowly construed or not,[113] the Exclusion simply doesn't concern Alliant's

---

[109]  *See, e.g.*, *id.* ¶¶ 160-230, 249.

[110]  *See, e.g.*, OATK Insurers Op. Br. at 28-30.

[111]  *See GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties. . . ." (internal quotation marks omitted).

[112]  *See* OATK Policies, Endorsement #39 ("This endorsement . . . forms a part of policy number [redacted] issued to Orbital ATK, Inc."); Or. Arg. Tr. at 67 ("[The Court:] Let's look at the policy itself.  Does it list Alliant as the insured?"  [OATK Insurers' Counsel:] It does not, Your Honor."); *see also Ferrellgas*, 2020 WL 363677, at *11-13 (using policy definitions to orient analysis of same exclusion).

[113]  *See, e.g.*, *Med. Depot*, 2016 WL 5539879, at *7 (observing that exclusions are interpreted narrowly).

Wrongful Acts.  And why would it?  Alliant had its own Policies and OATK reasonably expected that it was purchasing separate insurance for its separate liabilities.[114]

Last, the OATK Insurers complain that this reading renders the Prior Acts Exclusion superfluous.  Not so.  If an insured's management were sued for misconduct arising prior to and during the policy period but attributable to an overlap in their pre-period and in-period roles, then a prior acts exclusion might apply.[115] Or, if OATK were sued for pre-period wrongdoing both under Delaware's "blue sky," Rule 10(b) counterpart, and Rule 10(b) itself, the Exclusion might apply to the substantively indistinct factual predicates for those claims.[116]  But just because OATK's managers were sued in unconnected capacities for wrongdoing with different aims engaged at different firms doesn't mean the Exclusion is inconsequential.  It simply means the Exclusion is of no consequence under these facts[117]—and that the OATK Policies cover the 10(b) Claim.

---

[114] *See Med. Depot*, 2016 WL 5539879, at *7 (observing that insurance contract interpretation should mind the insured's reasonable expectations where language is unambiguous); *see also Exelon*, 176 A.3d at 1263 (observing that all contract interpretation must respect the parties' mutual intent at the time of contracting).

[115] *See Tile Shop Holdings, Inc. v. Allied World Nat'l Assurance Co.*, 981 F.3d 655, 659-60 (8th Cir. 2020) (resolving this fact pattern in the insurer's favor).

[116] *Compare* 17 C.F.R. § 240.10b-5 (2000) *with* DEL. CODE ANN. tit. 6 § 73-201 (2020) (setting forth same elements as Rule 10b-5 and authorizing private suits).

[117] *Cf. Sonitrol Holding Co. v. Marceau Invs.*, 607 A.2d 1177, 1183 (Del. 1992) ("[A] contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless"

### b. The 14(a) and 10(b) Claims are Neither "Fundamentally Identical" Nor "Interrelated" Under Delaware Law.

If this decision only were about the OATK Policies, then the coverage discussion would stop here. Since it is not, the Court will entertain—and reject—the OATK Insurers' Prior Acts Exclusion arguments on the merits as a means of resolving the parallel question of whether the 10(b) Claim is covered under the Alliant and Orbital Sciences Policies as an "Interrelated Wrongful Act."

Again, Delaware law applies. And in Delaware, when an insurer invokes an exclusion resting on the "relatedness" of Wrongful Acts, coverage for the purportedly-excluded Act will be "precluded only where the two underlying claims are fundamentally identical."[118] To determine whether two claims are fundamentally identical, Delaware courts look to the "subject" of the claims to see if they are "the exact same" and do not merely share "thematic similarities."[119] When doing so, the underlying claimant's "unilateral characterizations" of the claims need not be

---

or in a way that "frustrates the meaning, purpose and intent of the parties' agreement." (citations omitted)).

[118] *Pfizer*, 2019 WL 3306043, at *9 (internal quotation marks omitted); *see United Westlabs, Inc. v. Greenwich Ins. Co.*, 2011 WL 2623932, at *11-12 (Del. Super. Ct. June 13, 2011) (same).

[119] *Pfizer*, 2019 WL 3306043, at *10.

credited.[120]  Instead, the Court will draw reasonable inferences from the complaint as a whole.[121]

In support of the Exclusion, the OATK Insurers start by contending the 14(a) and 10(b) Claims are not simply related—they are one "Claim."  They insist that because the Policies define Claim in a singular way, a lawsuit meeting that definition must be one Claim, no matter how many theories of relief a plaintiff seeks therein.[122]  Not according to our Supreme Court.[123]  A single litigation can involve multiple Claims potentially-covered even where the Claims grow from a common nucleus of misconduct.  As a result, the 14(a) and 10(b) Claims are two "Claims" and coverage is barred only if they are fundamentally identical.

They aren't.  The 14(a) Claim alleged wrongdoing pertaining to pre-merger proxy solicitation misstatements about Alliant and Orbital Sciences' synergies that were calculated to coerce stockholder approval of a transaction saddled with low-return prospects.[124]  The 10(b) Claim alleged wrongdoing in connection with

---

[120] *IDT Corp.*, 2019 WL 413692, at *10 (internal quotation marks omitted).

[121] *Id.* (citing *Blue Hen Mech., Inc. v. Atl. States Ins. Co.*, 2011 WL 1598575, at *2 (Del. Super. Ct. Apr. 21, 2011), *aff'd*, 29 A.3d 245 (Del. 2011)).

[122] OATK Insurers Op. Br. at 31-38.

[123] *AT&T Corp.*, 918 A.2d at 1108-10.

[124] *See, e.g.*, *Knurr* Compl. ¶¶ 258, 260, 268, 290, 292, 303-308, 311-314; *see also* 17 C.F.R. § 240.14a-9 (2009) (setting forth liability elements for proxy violations).

OATK's post-merger financial reporting that defrauded investors into trading OATK stock substantially-less-valuable than OATK and its managers led the secondary market to believe.[125] Variations in timing, breed of securities violation, *mens rea*, motive, and burdens of proof, under each regulation, indicate these Claims do not involve "the exact same subject."[126] And so, though the two Claims might seem "thematic[ally] similar[]"—*e.g.*, the alleged wrongdoers, dual-status investors, financial reporting misconduct about the Lake City Contract,[127] and the transaction itself—that doesn't make them fundamentally identical.[128] Accordingly, the 10(b) Claim isn't "related" to the 14(a) Claim under Delaware law and the Prior Acts Exclusion doesn't apply.

In contrast to the Prior Acts Exclusion, the "Interrelated Wrongful Acts" endorsements in the Alliant and Orbital Sciences Policies are coverage-granting.[129] Put differently, under those Policies, the 10(b) Claim *would* be covered if it were

---

[125] *See, e.g.*, *Knurr* Compl. ¶¶ 64-122; *see also* 17 C.F.R. § 240.10b-5 (setting forth liability elements for fraud in sales of securities).

[126] *Pfizer*, 2019 WL 3306043, at *10 (internal quotation marks and citations omitted); *see Med. Depot*, 2016 WL 5539879, at *14; *United Westlabs*, 2011 WL 2623932, at *11-12.

[127] The OATK Insurers stress the importance of this liability. But the Court is not limited to a plaintiff's unilateral characterizations of its claims. When looking to the complaint as a whole, the Lake City Contract is a thematic similarity—not a dispositive motif. *See IDT Corp.*, 2019 WL 413692, at *10.

[128] *See Pfizer*, 2019 WL 3306043, at *9 (construing exclusions strictly).

[129] Alliant Policies, Endorsement #49; Orbital Sciences Policies, Endorsement #36.

fundamentally identical to the 14(a) Claim. But because they are not fundamentally identical, coverage for the 10(b) Claim is unavailable under the Alliant and Orbital Sciences Policies. This, Northrop concedes.[130] And, therefore, Northrop need not take the (untenable) position of arguing the Claims are related under two Policy sets but unrelated under a third. Accordingly, coverage for the 10(b) Claim lies only with the OATK Policies.

### 3. The OATK Insurers Have Not Met Their Burden to Show Northrop's Investigation Fees are Not Defense Costs.

The OATK Insurers also move for summary judgment[131] on investigatory expenses which, in their view, are not Defense Costs. Their Policies define Defense Costs to include "reasonable fees, costs and expenses [incurred from] the *investigation . . .* of a Claim."[132] Nevertheless, they say the challenged fees were incurred pre-*Knurr* Litigation and thus were charged before "a Claim" existed. But Delaware law takes an expansive view of Defense Costs. In Delaware, "all expenses reasonably necessary to conduct the defense are covered, whether or not they have an ancillary benefit to the insured."[133]

---

[130] *See, e.g.*, Or. Arg. Tr. at 30-31.

[131] Northrop does not seek a judgment here or elsewhere on any of its fees.

[132] OATK Policies § 13 (emphasis added).

[133] *Legion Partners Asset Mgmt., LLC v. Underwriters at Lloyds London*, 2020 WL 5757341, at *11 n.87 (Del. Super. Ct. Sept. 25, 2020) (internal quotation marks omitted).

Here, there is opposing testimony about whether defense counsel used pre-*Knurr* insights to defend *Knurr* once filed.[134] As a result, there is a genuine issue of material fact—or at least a need for clarification[135]—about whether those fees were "reasonably necessary" to minimizing litigation expenses and developing strategies for defeating the *Knurr* class. Indeed, as the OATK Insurers have suggested,[136] the investigatory fees, though spent pre-*Knurr*, benefitted the *Knurr* defendants and may have been incurred during discovery anyway. After all, assistance was secured to account for the Lake City Contract and the OATK Insurers have maintained that the entire *Knurr* Litigation revolved around that liability. And so, even if the costs' benefits were "ancillary," that does not necessarily render them non-Defense Costs.[137] The OATK Insurers can fight that bill at trial.[138]

---

[134] *See, e.g.*, Exhibits 51-52 (D.I. 671).

[135] *See IDT Corp.*, 2019 WL 413692, at *5 ("[W]here it seems prudent to make a more thorough inquiry into the facts, summary judgment is denied and the matter submitted for resolution by trial." (citing *Ebersole*, 180 A.2d at 470-72)); *accord Pathmark Stores*, 663 A.2d at 1191 (Court may exercise discretion to deny summary judgment "if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[136] *See* Or. Arg. Tr. at 70 ("[OATK Insurers' Counsel:] I'd submit to the Court that's a fortuitous coincidence [that] the work required for the internal investigation had useful application to the subsequently filed *Knurr* [L]itigation.").

[137] *Legion*, 2020 WL 5757341, at *11 n.87 (internal quotation marks omitted).

[138] *CNH Indus.*, 2015 WL 3863225, at *1 (burden on movant to show no genuine issue of material fact); *see Moore*, 405 A.2d at 680 (same).

**B. THE ORBITAL SCIENCES POLICIES MAY COVER THE 14(a) CLAIM AND SUMMARY JUDGMENT IS UNWARRANTED ON THE LATE-NOTICE DEFENSE.**

The Orbital Sciences Insurers also raise a conflict between Delaware and Virginia law.

**1. Under Delaware law, the Late-Notice Defense Cannot be Resolved on Summary Judgment.**

*a. Delaware and Virginia Law are Not in Conflict Here.*

The Orbital Sciences Policies do not specify a governing law. The Court, then, will determine if an actual conflict exists between Delaware and Virginia law on the particular issues involved.[139] But the Court can "avoid a choice-of-law analysis altogether if the result would be the same under the law of either of the competing jurisdictions."[140] For identical outcomes occasion false conflicts and necessitate application of Delaware law.[141]

Central to the putative conflict here is the Orbital Sciences' Insurers late-notice defense. The parties agree that both Delaware and Virginia courts usually assess late notice under two rubrics: (1) justification for the delay, *i.e.*, the reasonableness of an insured's excuse for its untimely notice; and (2) prejudice to

---

[139] *Pfizer*, 2019 WL 3306043, at *6.

[140] *Id.*

[141] *Laguelle*, 2013 WL 5460164, at *2; *see Gallup*, 2015 WL 1201518, at *8-9.

-32-

the insurer's ability to participate in the defense.[142]  They disagree, though, about how that evaluation would turn out.  The Orbital Sciences Insurers contend that Virginia courts disregard prejudice when a justification is unreasonably lengthy, but that Delaware courts do not.[143]  Northrop attacks the Virginia decisions in which prejudice was ignored and insists the result would be the same under either law on these facts.[144]  If Northrop is right, then the Orbital Sciences Insurers concede they are not entitled to summary judgment on the late-notice defense.[145]  And so, the Court must review the law that thumbs their motion's fate.

### i.  Virginia Late-Notice Law

Under Virginia law, a "delay in providing notice" precludes coverage when the delay amounts to a "substantial and material" failure to timely notice the

---

[142] *See, e.g.*, *Wilhelm v. Nationwide Gen. Ins. Co.*, 2011 WL 4448061, at *4 (Del. Super. Ct. May 11, 2011), *aff'd*, 29 A.3d 246 (Del. 2011); *Falcon Steel Co., Inc. v. Md. Cas. Co.*, 366 A.2d 512, 514 (Del. Super. Ct. 1976); *Penn-Am. Ins. Co. v. Mapp*, 461 F. Supp. 2d 442, 452 (E.D. Va. 2006); *Atlas Ins. Co. v. Chapman*, 888 F. Supp. 742, 745-46 (E.D. Va. 1995) (citing *State Farm Mut. Auto. Ins. Co. v. Douglas*, 148 S.E.2d 775, 777 (Va. 1966)).

[143] *See, e.g.*, Orbital Sciences Insurers Op. Br. at 25 (claiming that under Delaware law, "prejudice cannot be established by the passage of time," and that Northrop waited 438 days); Or. Arg. Tr. at 11 ("[Orbital Sciences Insurers' Counsel:] [U]nder Virginia law insurers can receive summary judgment without consideration of prejudice on a late notice defense.  Delaware has no such body of case law, and that means that there is a clear outcome determinative conflict. . . .").

[144] *See, e.g.*, Or. Arg. Tr. at 27 ("[Northrop's Counsel:] Northrop isn't arguing that there is no conflict just based on the fact that prejudice exists in both of the standards.  The reality is . . . the same result is achieved here if you apply either. . . .").

[145] *Id.* at 16 ("[Orbital Sciences Insurers' Counsel:] [I]f Delaware law applies to the late notice defense, the parties agree that the late notice issue is not amenable to resolution on summary judgment.").

insurer.[146]  To determine whether such failure is substantial and material, Virginia courts apply "a three-factor test" that balances "the reasonableness of the delay, the duration of the delay, and whether the insurer suffered prejudice."[147]  The "reasonableness" or justification factor is measured "from an objective standpoint" and generally asks whether the insured notified the insurer when it "reasonably appear[ed] . . . that the policy may be involved."[148]  And a delay too long "may breach the policy even absent a showing of prejudice."[149]

But Virginia courts don't consider these factors in the abstract.  At the threshold, they look to the "plain and ordinary meaning" of the notice provision.[150]  Too, timing is critical.  Virginia courts focus on party-inserted deadlines, which serve as metrics for quantifying a delay's reasonableness.[151]  And those measures

---

[146] *Builders Mut. Ins. Co. v. Wedge Constr., Inc.*, 423 F. Supp. 3d 253, 257 (E.D. Va. 2019) (internal quotation marks omitted); *see State Farm Mut. Auto. Ins. Co. v. Porter*, 272 S.E.2d 196, 199 (Va. 1980).

[147] *Wedge Constr.*, 423 F. Supp. 3d at 257 (citing *N. River Ins. Co. of N.Y. v. Gourdine*, 135 S.E.2d 120, 124 (Va. 1964)) (internal quotation marks omitted).

[148] *Wedge Constr.*, 423 F. Supp. 3d at 257 (citing *Dan River Inc. v. Commercial Union Ins. Co.*, 317 S.E.2d 485, 489 (Va. 1984)) (internal quotation marks omitted).

[149] *Wedge Constr.*, 423 F. Supp. 3d at 257 (internal quotation marks omitted); *see State Farm Fire & Cas. Co. v. Walton*, 423 S.E.2d 188, 192 (Va. 1992).

[150] *Wedge Constr.*, 423 F. Supp. 3d at 256 (citing *Transcon. Ins. Co. v. RBMW, Inc.*, 551 S.E.2d 313, 318 (Va. 2001)) (internal quotation marks omitted).

[151] *See Wedge Constr.*, 423 F. Supp. 3d at 256-57 ("It is well-settled in Virginia that provisions requiring written notice of an accident be give as soon as practicable . . . are reasonable and enforceable.  [These] notice provisions are designed to afford the insurer the opportunity to make

appear most exacting when insurance counterparties agree that notice must be provided "as soon as practicable" in policies covering personal or property injuries but the insured notices the insurer months or years later without sufficient excuse or any justification at all.[152] It is with that language and those circumstances only that Virginia courts seem at all likely to relieve insurers of demonstrating prejudice.[153]

### ii. Delaware Late-Notice Law

Delaware law is less nuanced in this area, but the relevant principles are clear. When a casualty insurance policy requires notice be given "as soon as practicable," an insurer must demonstrate: "(1) that the insured did not provide notice as soon as practicable, and (2) that the insurer suffered prejudice as a result of the delay."[154] And in general, "an insured's breach of the notice provision, without prejudice to

---

a timely investigation . . . and to prepare an adequate defense. . . ." (cleaned up)); *see also Gourdine*, 135 S.E.2d at 123.

[152] *See, e.g.*, *Wedge Constr.*, 423 F. Supp. 3d at 258-59 (fifteen-month delay was not "as soon as practicable" in accident context when justification was not based on "reason of health" or other non-subjective circumstance (citations omitted)); *Va. Farm Bureau Mut. Ins. Co. v. Sutherland*, 2004 WL 2360162, at *3 (W.D. Va. Oct. 19, 2004) (601-day delay was not "as soon as practicable" in accident context when insured "failed to provide any notice" (citations omitted)); *Chapman*, 888 F. Supp. at 746 (four-month delay was not "as soon as practicable" in accident context when insured did not offer "any excuse or sufficient justification" (citations omitted)).

[153] *See, e.g.*, *Walton*, 423 S.E.2d at 191-92; *State Farm Fire & Cas. Co. v. Scott*, 372 S.E.2d 383, 384-85 (Va. 1988); *Porter*, 272 S.E.2d at 199-200; *but see Gourdine*, 135 S.E.2d at 123-25 (requiring demonstration of prejudice, though policy contained "as soon as practicable" clause, because insured had tried to put the insurer on notice of his car accident several times).

[154] *Wilhelm*, 2011 WL 4448061, at *4 (citing *Falcon Steel*, 366 A.2d at 514-17), *aff'd*, 29 A.3d 246.

the insurer, will not relieve the company of its liability under the contract."[155]  Still,

Delaware courts recognize that "an inordinate lapse of time" may put an insurer "in

a less favorable position to defend [a] claim than it would have been had the

notification been as soon as practicable."[156]  In other words, a sufficiently

unreasonable or totally unjustified delay might, *a fortiori*, establish prejudice.[157]  As

a result, though Delaware courts almost without fail articulate "prejudice" as a

required element, they nevertheless have on occasion treated prejudice as

commensurate with delay where notice was required as soon as practicable but the

insured's tardiness was unexcused as a matter of law.  That's not too far from

skipping a prejudice analysis altogether.

### iii. The Result Under Either Would Be the Same Here.

What unifies Virginia and Delaware law on the prejudice prong is also what

dissembles the Orbital Sciences Insurers' conflict arguments.

---

[155] *Johnson*, 320 A.2d at 346.

[156] *Wilhelm*, 2011 WL 4448061, at \*5 (citing *Johnson*, 320 A.2d at 346-47) (internal quotation marks omitted).

[157] *See Wilhelm*, 2011 WL 4448061, at \*5-6 (titling discussion "*Defendant is Prejudiced as a result of Plaintiffs' Eleven Year Delay in Filing*" and equating factual circumstances surrounding 11-year delay with prejudice (emphasis in original)).  The Court's research reveals that the only case in which prejudice was considered despite a total absence of pre-litigation notice involved Delaware's "uninsured motorist" statute—not a policy-based notice provision. *See Drainer v. AIG Annuity Ins. Co.*, 2009 WL 1638641, at \*1 (Del. Super. Ct. May 14, 2009); *cf. Wilhelm*, 2011 WL 4448061, at \*4-5 (distinguishing *Drainer* for additional reasons).

*First*, both states are inclined to eliminate—indiscriminately or functionally—prejudice in casualty cases involving lesser-sophisticated insureds who sleep on their duties and squander evidence integral to a potent defense. But here, neither would be likely to remove prejudice from the equation. This case concerns a securities class action that accused sophisticated corporate and high-ranking insureds of harming investors with information publicly filed and readily available for an insurer's attention.

*Second*, both jurisdictions impose a heightened diligence standard on insureds when their agreements *only* require notice be sent "as soon as practicable." But here, neither jurisdiction's time-sensitive logic would obtain. The Orbital Sciences Policies require notice to be sent "as soon as practicable" *or* "in no event later than . . . (ii) expiration of the Extended Reporting Period or Run-Off Coverage Period" (*i.e.*, six years).[158] A 438-day delay may be facially prejudicial when notice is required "as soon as practicable," but not when an insured may wait six years.

And *third*, the controlling Virginia and Delaware cases involved a complete or near-complete default on notice obligations. But here, Northrop has gathered an array of (genuinely-disputed) facts suggesting that the Insurers were notified—

---

[158] Endorsement #18.

directly or constructively—but did nothing.[159]  The Orbital Sciences Insurers, as movants, had to show those facts were immaterial and that notice was unexcused as a matter of law.  They didn't.  Accordingly, the result would be the same:  the Orbital Sciences Insurers must demonstrate prejudice under either state's law.  The conflict, then, is false.  Delaware law, therefore, applies.  And by concession, summary judgment is denied and the Orbital Sciences Insurers' late-notice defense will be subject to trial.

### b. Even if Delaware and Virginia Law Were in Conflict, Delaware Law Still Would Apply.

If the Court here is wrong and there is indeed an actual conflict then a most significant relationship analysis must be conducted.[160]  The *Second Restatement of Conflict of Laws* § 188's network of contacts connects the most interested state among competing fora with the litigation's subject.[161]  In theory, this state is the one that would have been chosen bilaterally.  Indeed, predictability, among other considerations, drives the *Second Restatement*.[162]  As a result, the § 188 factors are

---

[159] *See, e.g.*, Exhibits 9, 14, 18, 20-24, 26-29, 30-37, 40-44, 46-47 49-50, 52 (D.I. 668, 671, 695); *see also* Northrop's Answering Brief at 13-25 (D.I. 667) (raising disputes in these exhibits in opposition to Orbital Sciences Insurers' motion).

[160] *See Pfizer*, 2019 WL 3306043, at *6 (citing *Chemtura*, 160 A.3d at 464).

[161] *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (AM. L. INST. 1971) (hereinafter, "RESTATEMENT (SECOND)") (listing contacts).

[162] *See Chemtura*, 160 A.3d at 470-71; *accord CNH Indus.*, 2018 WL 3434562, at *5.

not merely check-boxed—they're ascribed differing weight in differing circumstances—so as to promote legal consistency and litigants' justified expectations.[163]

This in mind, the Orbital Sciences Insurers summon the following relationships between their Policies, this lawsuit and Virginia: (1) Orbital Sciences was headquartered in Virginia; (2) the *Knurr* Litigation was filed in Virginia federal court; (3) the Policies were solicited in Virginia; (4) the Policies were brokered, negotiated and issued "in Virginia or New York, but certainly not in Delaware"; and (5) the Policies contain endorsements that reference Virginia law.[164] But the Insurers fail to mention that the Orbital Sciences Policies are D&O liability insurance agreements sold to reduce a Delaware organization's exposure to claims concerning its management and internal affairs.

This Court has held consistently that, in the D&O insurance context, Delaware takes an overriding interest in disputes involving coverage for fiduciary

---

[163] *See Chemtura*, 160 A.3d at 465 ("The § 188 factors . . . are meant to be evaluated based on their relative importance in the particular case and in light of the *Second Restatement*'s general considerations. . . ." (citations omitted)); *see also Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 805 (Del. Ch. 2020) ("The comments to Section 188 explain that a particularly significant factor for contract cases is upholding the justified expectations of the parties. Protecting this interest promotes 'the values of certainty, predictability and uniformity of result.'" (citing RESTATEMENT (SECOND) § 188 cmt. a)).

[164] Orbital Sciences Insurers Op. Br. at 25-27; *see* RESTATEMENT (SECOND) §§ 188(a)-(b), (d)-(e).

mismanagement of Delaware organizations.[165] That is so because predictability for and the justified expectations of Delaware firms are vindicated when their state of incorporation resolves questions about the "honesty and fidelity" of their Delaware officials (*e.g.*, violating federal law by defrauding investors).[166] And in vindicating those interests, this Court eschews claims-centric approaches to coverage and focuses instead on the insurance policies as a whole.[167] Accordingly, where, as here, some *Second Restatement* § 188 factors lean in favor of an alternate state, these unique Delaware D&O contacts supersede and ultimately tip the rest in Delaware's favor.[168]

---

[165] *See, e.g.*, *Ferrellgas*, 2020 WL 363677, at *4 & n.42; *Pfizer*, 2019 WL 3306043, at *8; *IDT Corp.*, 2019 WL 413692, at *6-7; *Murdock*, 2018 WL 1129110, at *10-11; *Mills*, 2010 WL 8250837, at *5-6.

[166] *Murdock*, 2018 WL 1129110, at *9 (observing that D&O insurance is implicated whenever "the directors' and officers' 'honesty and fidelity'" to a Delaware corporation has been challenged (quoting *Mills*, 2010 WL 8250837, at *6)); *accord Pfizer*, 2019 WL 3306043, at *8 ("Where D&O coverage is at issue 'and the choice of law is between the headquarters and state of incorporation, the state of incorporation has the most significant relationship.'" (quoting *Murdock*, 2018 WL 1129110, at *9); *IDT Corp.*, 2019 WL 413692, at *6; *see* DEL. CODE ANN. tit. 8, § 145 (2020) (enabling Delaware entities to purchase insurance for their fiduciaries and making indemnification mandatory in certain cases).

[167] *See Pfizer*, 2019 WL 3306043, at *8 ("[W]hen applying the *Second Restatement* factors to a corporate-wide insurance program, 'the inquiry should center on the insurance contracts and not the underlying claims.'" (quoting *CNH Indus.*, 2018 WL 3434562, at *1)).

[168] *See Pfizer*, 2019 WL 3306043, at *6-8 (evaluating RESTATEMENT (SECOND) § 188 factors and concluding presence of a D&O insurance policy and insured's Delaware incorporation status diminished New York's—but strengthened Delaware's—contacts); *cf. Focus Fin.*, 241 A.3d at 805 ("[T]he parties' contractual expectations should not be disappointed by application of [a state law] which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed" by the interests of another state. (citing RESTATEMENT (SECOND) § 188 cmt. a) (internal quotation marks omitted)).

Orbital Sciences was a Delaware corporation and its fiduciaries were sued for managerial misconduct construed fairly to lack "honesty and fidelity" to it.[169]  So, the Orbital Sciences Insurers' attempts to colonize Virginia with principal places of business and negotiation sites fail.  Moreover, that the *Knurr* plaintiffs picked Virginia federal court is of no moment.  When "a corporate-wide insurance program" is implicated, the Court "center[s] on the insurance contracts and not the underlying claims."[170]  The Orbital Sciences Policies are D&O liability policies insuring a Delaware-organized business's fiduciaries no matter the wrongdoing alleged, the principal place of business or the state in which the suit was brought.[171]  Delaware law applies and summary judgment on the late-notice defense is denied.

## 2. The Orbital Sciences Insurers Have Not Met Their Burdens to Show that OATK is Not Orbital Science's "Successor" and that Orbital Sciences' Directors' Liability is Not Covered.

Aside from their late-notice defense, the Orbital Sciences Insurers contend

---

[169] *IDT Corp.*, 2019 WL 413692, at *6 (internal quotation marks omitted); *see Murdock*, 2018 WL 1129110, at *9; *Mills*, 2010 WL 8250837, at *6 ("When the conduct of a corporation's directors and officers is centrally implicated, the place of incorporation is important.").

[170] *Pfizer*, 2019 WL 3306043, at *8 (internal quotation marks omitted).

[171] *See CNH Indus.*, 2018 WL 3434562, at *5 (When faced with "a comprehensive, nationwide insurance scheme that would invariably involve underlying claims from multiple states," application of a state's law "not . . . contrary to the parties' initial expectations . . . avoid[s] the risk of a court inconsistently applying identical policy language within a single integrated insurance scheme." (internal quotation marks and citations omitted)); *see also* Or. Arg. Tr. at 36 (Orbital Sciences Insurers acknowledging Delaware's D&O jurisprudence undercuts the Insurers' conflict arguments).

that coverage is unavailable for the 14(a) Claim because OATK was not sued "solely" as "successor" to Orbital Sciences and Thompson and Pierce never were indemnified by Orbital Sciences.[172] Under the Policies, "coverage . . . for Claims made against any Insured shall extend to the Buyer, Buyer's Acquisition Company and its Insured Persons solely in their capacity as the successor to the Policyholder."[173] And Loss includes amounts "for which [Orbital Sciences] grants indemnification to . . . Insured Persons."[174] The Insurers concede this coverage language is unambiguous.[175]

Read broadly,[176] the Successor-in-Interest endorsement triggers whenever an entity[177] becomes a pinch-hitter for Orbital Sciences. Here, the 14(a) stockholders tagged OATK with liability for pre-merger proxy misstatements made by Orbital

---

[172] Orbital Sciences Insurers Op. Br. at 46-48.

[173] Orbital Sciences, Endorsement #36.

[174] *Id.* Side B Coverage.

[175] *See* Or. Arg. Tr. at 10.

[176] *See Med. Depot*, 2016 WL 5539879, at *7 (Court construes coverage language broadly to protect insured's "reasonable expectations." (citations omitted)).

[177] Though the Insurers implied in their brief that only the defined entities can be successors, at oral argument they seemed to accept that OATK, which isn't a defined entity, can be a successor. *See* Or. Arg. Tr. at 21. That shifted position better reflects the nature of a non-illusory endorsement, as neither Alliant nor Vista Merger Sub, Inc. survived post-closing. *See O'Brien,* 785 A.2d at 287 ("Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless." (internal quotation marks omitted)); *SS&C Techs. Holdings v. Endurance Assurance Corp.*, 2020 WL 6335898, at *7 (Del. Super. Ct. Oct. 29, 2020) (applying this principle to resolve policy dispute on summary judgment).

Sciences (vicariously) through its managers.[178] But OATK didn't exist at the time the proxy statements were made. So, it could have been sued "solely" as a "successor" to Orbital Sciences—not as a primary wrongdoer.[179] Accordingly, the Orbital Sciences Insurers haven't demonstrated non-coverage as a matter of law.

Resisting this natural interpretation, the Orbital Sciences Insurers try to weaken OATK's successor status by mixing its responsibility for both Alliant *and* Orbital Sciences's pre-merger conduct. But the key language says "solely in the capacity as a successor" to Orbital Sciences. Alliant is irrelevant to this clause. And still, even with respect to Alliant, it could have been sued solely as a successor— Alliant dissolved when its stock was converted. As long as OATK was not sued for its own wrongdoing, coverage may lie here.

Finally, on the Insurers' read, the indemnification requirement in the Policies' Side B coverage could make post-transaction insurance for pre-transaction liabilities illusory.[180] Orbital Sciences could not indemnify Thompson and Pierce after they left the firm to run OATK. Yet, the Policies were renegotiated—due to the

---

[178] *See, e.g.*, *Knurr* Compl. ¶¶ 1, 15, 258-301.

[179] This possibility is reinforced by the plain meaning of "successor" and because Northrop, as the non-movant, is entitled to the benefit of favorable inferences. *See Successor*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A corporation that, through . . . consolidation . . . of interests[,] is vested with the rights and duties of an earlier corporation."); *see In re Verizon Coverage Appeals*, 222 A.3d 566, 578-79 (Del. 2019) (endorsing plain meaning analysis of undefined insurance terms); *Judah*, 378 A.2d at 632 (affording favorable inferences to non-movant).

[180] *But see O'Brien,* 785 A.2d at 287.

consolidation—to extend coverage for a six-year run-off period. As a result, the counterparties plainly contemplated coverage for liabilities arising from that transaction. But construing the indemnification requirement to thwart coverage would make the run-off endorsement worthless and frustrate the parties' mutual intent at the time of contracting.[181] And so, even if Northrop has not shown Orbital Sciences's indemnification as a matter of fact, the Insurers have not demonstrated a non-illusory purpose to this requirement as a matter of Delaware contract law. Accordingly, summary judgment on these points can't be granted.[182]

### C. THE ALLIANT POLICIES COVER THE 14(a) CLAIM AND THE ALLIANT INSURERS HAVE NOT MET THEIR BURDEN TO SHOW THE CHALLENGED DEFENSE COSTS ARE NOT COVERED.

As an initial matter, Delaware law applies to the construction of these Policies for the reasons discussed above. The parties agree the language involved in the 14(a) Claim analysis is unambiguous.[183] And the Alliant Insurers also admit the language pertinent to the Defense Costs analysis is plain.[184] So the Court follows the drafter's words and resolves any ambiguity in them against the Alliant Insurers.

---

[181] *See Exelon*, 176 A.3d at 1263; *Med. Depot*, 2016 WL 5539879, at *7; *see also Salamone*, 106 A.3d at 367–68.

[182] *See, e.g.*, *IDT Corp.*, 2019 WL 413692, at *5 (Court "cannot grant any party's motion for summary judgment under Delaware Superior Court Civil Rule 56 unless no genuine issue of material fact exists *and that party is entitled to judgment as a matter of law*." (citing Del. Super. Ct. Civ. R. 56) (emphasis added)).

[183] *See, e.g.*, Or. Arg. Tr. at 92 (Northrop's argument); *id.* at 106, 117 (Alliant Insurers' argument).

[184] *See id.* at 123.

### 1. The Bump Up "Provision" is an Exclusion.

Northrop and the Alliant Insurers have cross-moved on the application of a term in the Alliant Policies excepting certain Loss from coverage. But a proper construction of this term first requires a determination of whether it is a coverage provision or an exclusion.[185] If it is a coverage provision, then the burden is on Northrop to satisfy its elements,[186] which will be broadly construed.[187] But if it is an exclusion, then the burden is on the Alliant Insurers to satisfy its elements,[188] which will be strictly and narrowly construed.[189]

The Bump Up "Provision" is housed in the Policies' definition of Loss, rather than in the section enumerating exclusions.[190] Its language, though, has an exclusionary ring: "Loss . . . *shall not include any* amount" that "effectively increased" "inadequate" "consideration" "paid for the acquisition . . . of all or

---

[185] *See Pfizer*, 2019 WL 3306043, at *9 ("Proper construction of insurance policies depends largely on the type of policy provision at issue.").

[186] *See Zurich Am. Ins. Co. v. Syngenta Crop Prot., LLC*, 2020 WL 5237318, at *5 (Del. Super. Ct. Aug. 3, 2020) (citing *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997)).

[187] *See Pfizer*, 2019 WL 3306043, at *9.

[188] *See, e.g.*, *Gallup*, 2015 WL 1201518, at *9.

[189] *See Pfizer*, 2019 WL 3306043, at *9.

[190] Alliant Policies § 13.

substantially all the ownership interest . . . in an entity."[191] Plainly read, the provision says an otherwise-covered Loss—*e.g.*, a settlement—suddenly loses coverage if the Insurers conclude it falls into this carve-out. As a result, a reasonable insured—and really any reasonable person[192]—would think "bump up" Loss is *excluded* from coverage.

Though the Alliant Insurers argue this is a coverage provision, they don't explain why.[193] Presumably, they think simply because it has been classified with Loss, it is, *de facto*, an element of coverage. But that formalism has been rejected by this Court and the only decision on which they rely. In *Gallup*, the insured argued that a Loss provision carving out "matters which are uninsurable" functioned as an exclusion which must be strictly construed.[194] This Court tacitly accepted that reasoning in finding the *insurer* failed to establish the Loss was uninsurable.[195] And

---

[191] *Id.* (emphasis added).

[192] *See, e.g.*, *Salamone*, 106 A.3d at 367–68 (Court should interpret contractual language as it "would be understood by an objective, reasonable third party.").

[193] *See* Or. Arg. Tr. at 113 ("[Alliant Insurers' Counsel:] Now, Northrop actually has the burden of proving the 14(a) settlement constitutes covered loss. We discussed the case law in our brief supporting this."); *but* National Union Op. Br. at 19-25 (repeatedly referring to the bump-up term as a "provision," though not discussing why it isn't an exclusion).

[194] 2015 WL 1201518, at *4-5.

[195] *Id.* at *9-11.

in *Onyx Pharms. Inc. v. Old Republic Ins. Co.*,[196] the Superior Court of California—interpreting the exact same "bump up" language in a National Union policy—concluded it was an exclusion, not a condition precedent to coverage.[197] No one disputes that the *Knurr* settlement is a settlement and therefore, Loss.[198] Accordingly, the Insurers must show the Bump Up Exclusion withstands narrow construction and clearly negates, after the fact, coverage extant in the first place.

**2. The 14(a) Claim is Covered.**

In relevant part, the Bump Exclusion provides –

> In the event of a Claim alleging that the price or consideration paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest or assets in an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price is effectively increased. . . .[199]

---

[196] No. CIV 538248 (Cal. Super. Ct. filed Oct. 1, 2020) (Exhibit BB, (D.I. 528)). This case is available only as a slip opinion, and per California procedural rules, was marked "tentative" at the time of decision pending objections. The parties discussed and relied upon it during oral argument last month; so, the Court assumes it is still good law.

[197] *Id.* slip op. at 15 ("The Court finds that the Loss Exclusion [*i.e.*, the Bump Up "Provision"] is an *exclusion*, and should be treated as an exclusion[,] as there is coverage in the initial definition of Loss, only potentially limited by the subsequent Loss Exclusion." (emphasis in original)); *but see* National Union Op. Br. at 20-21 (citing *Onyx* and suggesting insured failed to meet its coverage burden, not that an exclusion applied).

[198] Alliant Policies § 13 (defining Loss to include settlements).

[199] *Id.*

-47-

Narrowly and strictly construed, the string of terms weaves an exclusion of a lawsuit ("Claim") that "alleg[es]" only the "consideration" exchanged—nothing else—as part of only one specific control transaction (an "acquisition" of "all or substantially all ownership interest or "assets" of an "entity") was "inadequate." The Exclusion pushes out Loss only that "represent[s] an "effective[] increase[]" of the claimant's inadequate consideration; no other Loss will do. Almost every term is undefined, and so must be "afforded . . . separate and independent" plain meaning.[200] Heavy is that load, and the Alliant Insurers can't unambiguously[201] shoulder it.

To begin, the 14(a) Claim wasn't exclusively about the Orbital Sciences stockholders' "inadequate" "consideration" (*i.e.*, unwisely-exchanged stock).[202] Looking to the whole complaint,[203] the 14(a) Claim primarily was about Orbital Sciences's fiduciaries' "dissemination of a materially false and misleading Joint

[200] *IDT Corp.*, 2019 WL 413692, at *9 (citations omitted); *see In re Verizon*, 222 A.3d at 578-79 (reviewing dictionary meanings in construing undefined policy terms).

[201] *See Pfizer*, 2019 WL 3306043, at *9 (Exclusionary language must be "specific, clear, plain [and] conspicuous" to be enforceable. (internal quotation marks omitted)).

[202] *Consideration*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Something . . . bargained for and received by a promisor from a promise; that which motivates a person to do something, esp. to engage in a legal act. . . ."); *Inadequate*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/inadequate (last visited Jan. 25, 2021) ("not enough or good enough; insufficient").

[203] *See IDT Corp.*, 2019 WL 413692, at *10 (citing *Blue Hen*, 2011 WL 1598575, at *2, *aff'd*, 29 A.3d 245).

Proxy Statement . . . used to obtain approval of the [m]erger."[204]  Because of their alleged violations of federal law, the fiduciaries' misstatements "caused Alliant to be overvalued and impacted the [OATK ownership split]" and "depriv[ed] . . . the [c]lass of their right to a fully informed shareholder vote."[205]  So, this particularized species of wrongdoing not only coerced the Orbital Sciences stockholders to "accept inadequate consideration" *but also* "induc[ed] them to vote their shares" when they otherwise wouldn't have.[206]  Indeed, "inadequate consideration" alone would not sustain a 14(a) suit.  To the contrary, Rule 14(a) prevents a corporation's fiduciaries from lying to or misleading its investors.  It does not grant stockholders a revised appraisal of the equity they sold or compel a firm to redraw its ownership split.  Perhaps that is why the Exclusion applies to Claims—not only "Securities Claims."[207]  Paradigmatic dissenting stockholder cases in which the consideration for a control sale is challenged as unfair might likely be excluded.[208]  When

---

[204]  *Knurr* Compl. ¶ 260.

[205]  *Id.*

[206]  *Id.*  Though the Alliant Insurers would prefer the Court to read the phrase "inadequate consideration" in isolation every time it appears, the Court looks to the complaint as a whole and shuns "unilateral characterizations" made by a claimant.  *IDT Corp.*, 2019 WL 413692, at *10 (internal quotation marks omitted).

[207]  Alliant Policies § 13.

[208]  *See, e.g.*, *LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *9-15 (Del. Ch. June 30, 2015) (explaining the remedies available in an appraisal lawsuit to assure fair market value of sold stock had been paid).  As discussed below, *Onyx* was such a case.

compared, a federal securities class action about fabricated proxy forms is not the narrowly tailored fit this Exclusion imagined. Accordingly, the Insurers fail to establish this element.

Next, the Exclusion applies solely to a special type of transaction: an acquisition of all or substantially all of an entity's assets or ownership. An "acquisition" in the corporate transactions context means a "takeover of one corporation by another if both parties retain their legal existence after the transaction."[209] But here, the 14(a) allegations are replete with references to a "merger," which is what the Orbital Sciences managers and stockholders understood the deal to be.[210] Indeed, both sets of stockholders voted—the hallmark of a merger.[211] Too, Alliant did not retain a separate legal existence once the transaction had been completed. Its stock was cancelled and converted to OATK stock.[212]

The Alliant Insurers contend that the reverse triangular structure of the merger "involved" an acquisition, especially since Orbital Sciences survived.[213] But the

---

[209] *Corporate Acquisition*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[210] *Knurr* Compl. ¶¶ 260-286; Exhibit U, Joint Proxy Statement at 59-74 (D.I. 544) (explaining the structure and background of the "merger") (hereinafter, "Joint Proxy").

[211] *See* DEL. CODE ANN. tit. 8 §§ 251, 271 (2020) (providing distinct procedures for mergers and acquisitions); *cf. Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376-77 (Del. Ch. 2004) (explaining the purpose of an acquisition, which eliminates "all or substantially all" of the target's stockholders' interests (citations omitted)).

[212] Joint Proxy at 59.

[213] National Union Op. Br. at 21.

-50-

Bump Up Exclusion doesn't use the word "involved." Narrowly read, it bars Loss from a transaction which can only be called an "acquisition." It does not exclude an "acquisition" that is the penultimate step in a stock-for-stock merger. Two transactions that may be the same economically but are titled differently and demand dissimilar execution procedures have independent legal significance.[214] If the Policies were intended to exclude all transaction-based Claims—even though the Policies were renegotiated for a post-merger run-off period and added OATK as a successor—then their drafters could have written them that way.

Still, even with the Insurers' insertion, the Exclusion wouldn't apply. Alliant, which dissolved, didn't acquire all or substantially all the ownership of anyone in the end. The Alliant and Orbital Sciences stockholders shared 53.8% and 46.2% (respectively) in OATK once the transaction-as-challenged in *Knurr* closed.[215] That

---

[214] *See, e.g.*, *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 201-02 (Del. Ch. 2014) ("The mere fact that the result of actions taken under one [transactional procedure] may be the same as the result taken [through a different one] does not require that the legality of the result must be tested by the requirements [of the one not chosen]." (internal quotation marks and citations omitted)); *Warner Comms. Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989) (same). Delaware courts in noting the resemblance between stock acquisitions and reverse triangular mergers still have regarded them as independent transactions. *See Meso Scale*, 62 A.3d at 8 ("Both stock acquisitions and reverse triangular mergers involve changes in legal ownership, and the law should reflect parallel results."); *id.* at 84-85 (applying doctrine of independent legal significance to distinguish acquisitions and reverse triangular mergers).

[215] *See Hollinger*, 858 A.2d at 377-80 (collecting cases and analyzing the qualitative and quantitative factors Delaware courts consider when determining if the sale involved substantially all assets and, in any event, rejecting an "approximately half" standard).

joint ownership stake was the *Knurr* Litigation's chokepoint, as it could not have been so divided or bargained-for without allegedly illegal proxy materials.[216] At bottom, the *Knurr* class was indifferent to the transaction's shape or what became of Orbital Sciences after a barrage of transactional moves. Their gripe was with the negligent manner in which their former fiduciaries secured their votes and the bad ownership deal that mismanagement produced.

Finally, the Alliant Insurers can't show that the *Knurr* settlement "represent[s]" an "effective increase" of whatever "inadequate consideration" the Orbital Sciences stockholders bemoaned. Again, they rest on the same faulty premise here as before: that a Rule 14(a) claim is solely about an unfair equity exchange. To this end, the *Onyx* case is instructive.

In *Onyx*, the underlying stockholders brought a state law *breach of fiduciary duty claim* against Onyx's management for putting Onyx up for sale in response to an unsolicited, all-cash tender offer.[217] No doubt, that transaction was a takeover.[218] Its "auctioneer" duties activated, the board's mandate was to maximize profit for

---

[216] *Knurr* Compl. ¶¶ 284-94.

[217] *See Onyx*, slip op. at 6 ("This was *not* a situation where the class action plaintiffs asserted a misrepresentation/nondisclosure theory in order to obtain an injunction against the tender offer in the first place. This was *not* a situation where the class action plaintiffs pursued a remedy of obtaining revised disclosures to the shareholders for their consideration prior to consummation of the tender offer." (emphasis in original)).

[218] *Id.* at 5-6.

Onyx's stockholders, who would emerge on the other side without any investment interests.[219] It didn't. As a result, the stockholders sought as relief the upward-adjusted buyout price they should have obtained had Onyx's directors not "shut[] out or subvert[ed] any other" bidders.[220] In other words, they sought a "bump up" of the cash paid for their equity. And that is what the *Onyx* court found the excluded settlement did—"effectively increased" the sale price.[221]

The *Knurr* Litigation is different. Orbital Sciences wasn't sold to Alliant. It was merged indirectly with Alliant to spawn OATK. The Orbital Sciences stockholders didn't vanish post-closing. They and their former fiduciaries received measurable control over the new entity. The Orbital Sciences stockholders didn't seek an appraisal to "effectively increase[]" their stake or its value. They sought unelaborated "compensatory damages" for the "overvalued" Alliant-turned-OATK stock extracted through falsified proxy forms to effectively *decrease* what they "paid." And so, if the *Knurr* settlement—which admitted no wrongdoing—

---

[219] *See MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 501 A.2d 1239, 1248 (Del. 1985) (When the board of directors elects to sell the corporation, its role changes "to that of an auctioneer attempting to secure the highest price. . . ."). In corporate law parlance, this is known as "*Revlon* mode." *See TW Servs., Inc. v. SWT Acquisition Corp.*, 1989 WL 20290, at *7-8 (Del. Ch. Mar. 2, 1989) ("When a corporation is in *Revlon* mode, . . . the board [has a duty] to maximize[] . . . the company's value at a sale for the stockholders' benefit." (internal quotation marks omitted)); *see also Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 111-12 (Del. Ch. 2011) (explaining these duties further). California corporate law seems to have adopted the same principle. *E.g., Onyx*, slip op. at 4-6.

[220] *Onyx*, slip op. at 6.

[221] *Id.* at 33-34.

"represent[s]" anything at all, then it represents a "bump down"—not a "bump up." Accordingly, the Bump Up Exclusion doesn't apply as a matter of law.

### 3. Summary Judgment is Unwarranted on All Defense Costs.

The Alliant Insurers also seek to preclude coverage for expenses they believe are not "Defense Costs": (1) the same investigatory fees disputed by the OATK Insurers; (2) DeYoung's private counsel's fees; and (3) expenses for Thompson and Pierce's liability in "certifying" SEC-compliance and proxy materials. The Court focuses solely on the second and third batches because summary judgment is denied on the first for the reasons set forth above.[222]

#### a. DeYoung's Fees May Have Been "Jointly Incurred" with His Co-Defendants.

Though the Alliant Insurers acknowledge DeYoung is an "Insured Person," they insist many of his expenses do not reach the applicable retention because he hired separate counsel.[223] But the import of this fact is not without genuine issue. According to the Policies, "Defense Costs" include legal fees "(i) jointly incurred by . . . [OATK and Insured Persons]."[224] And "incurred" in the legal fees context

---

[222] *See supra* Section III.Part A.3; Or. Arg. Tr at 124 ("[Alliant Insurers' Counsel:] [W]e would agree that the Hogan and Alvarez costs are not defense costs . . . because [the Alliant Policies] have the same definition of defense costs as the [OATK] insurers. . . .").

[223] National Union Op. Br. at 27-28.

[224] Alliant Policies Endorsement #32 § 9(D).

plainly means "liable for payment at some point."[225]  Here, record evidence suggests that lead counsel for all *Knurr* defendants participated with DeYoung's counsel to avoid taking duplicative or inconsistent positions.[226]  As a result, DeYoung may have been "liable at some point" for the benefits conferred on him by the other defendants' counsel.[227]  Accordingly, summary judgment is unwarranted and the Alliant Insurers may argue at trial that DeYoung's defense fees actually were not "jointly incurred."

### b. Pierce and Thompson May Have Been Liable for "Certification" of the Joint Proxy Forms.

The Alliant Policies were amended to include Pierce and Thompson as Insured Persons for the technical purpose of "[c]ertification of [OATK f/k/a Alliant's] SEC Form No. 10K and 10Q filings . . . *and* provided in connection with the merger agreement [or its plan] or similarly titled contract executed by and between [Alliant and Orbital Sciences]."[228]  "Certification" means "the process of giving someone or something an official document stating that a specific standard

---

[225] *See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 684 (Del. 2013) (citations omitted).

[226] *See* Exhibits AA at 198:2-11 & BB at 198:17-200:25, Depositions Regarding Fees (D.I. 666).

[227] *See Legion*, 2020 WL 5757341, at *11 n.87 (noting Delaware's broad defense costs construction); *see also Med. Depot*, 2016 WL 5539879, at *7 (Court construes coverage language "broadly to protect the objectively reasonable expectations of the insured." (internal quotation marks omitted)).

[228] Alliant Policies Endorsement #45 (emphasis added).

has been satisfied."[229] Because OATK did not exist pre-merger, 10K and 10Q forms, which are annual reporting and financial performance documents, could not be filed for it. So, Pierce and Thompson's capacities must be directed to certifying Alliant's "filings . . . provided in connection with the merger" and its SEC-required forms.

The *Knurr* class alleged that Pierce and Thompson "caused the Joint Proxy" for the merger "to be filed with the SEC", which "by its own terms, was a joint proxy statement of Alliant *and* Orbital Sciences."[230] It "constituted a joint proxy statement under Section 14(a) of the Securities Exchange Act of 1934."[231] Too, the "Joint Proxy" incorporated "statements" about "Alliant's financial performance" from Alliant's separately-prepared 10K and 10Q forms.[232] And this information is precisely what the *Knurr* class alleged Pierce and Thompson made misleading or untrue.[233] This being so, the language in the endorsement can't be read to gerrymander Pierce and Thompson out of coverage simply because they were Orbital Sciences's managers at the time. Indeed, they could have been added in this capacity because the counterparties knew the proxy materials they were "certifying"

---

[229] *Certification*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[230] *Knurr* Compl. ¶ 267 (emphasis added) (internal quotation marks and brackets omitted).

[231] *Id.*

[232] *Id.* ¶¶ 270, 274-76.

[233] *Id.* ¶¶ 287-301.

to their stockholders contained representations about Alliant for transactional and regulatory purposes.[234] Accordingly, the Alliant Insurers haven't demonstrated that Pierce and Thompson were not liable as "Insured Persons" as a matter of law. Summary judgment thereon is, therefore, denied.

## D. THE VARIOUS ALLOCATION AND EXHAUSTION ISSUES CANNOT BE RESOLVED AT THIS STAGE.

Finally, the OATK and Excess Alliant Insurers have asked the Court to conclusively determine issues of allocation and exhaustion. In essence, they contend that it is mathematically impossible to reach their attachment points due to payments from layers underneath and the greatest Loss recoverable here.[235] And so, their requests continue, an allocation should be settled now because it could eventuate their dismissals from the case. The Court declines these invitations.

To the OATK Insurers: The record indicates—or at least raises a genuine issue as to whether—the *Knurr* settlement and attendant defense fees have climbed all rungs of the excess latter.[236] Until these totals are established, allocation and

---

[234] *See Exelon*, 176 A.3d at 1263 (observing that all contract interpretation should mind the parties' mutual intent at the time of contracting); *Med. Depot*, 2016 WL 5539879, at *11 ("In Delaware, an insurance policy is to be read in accord with the reasonable expectations of the insured." (citing *Johnson*, 320 A.2d at 347)).

[235] *See, e.g.*, Or. Arg. Tr. at 81-82 (OATK Insurers' argument), 127-34 (Excess Alliant Insurers' arguments).

[236] *See* Exhibit 31 §§ 1.12, 1.20 (D.I. 668) (indicating 10(b) Claim settlement for $62.4 million); Exhibit 51 (D.I. 668) (indicating a total of $26.7 million in defense costs).

exhaustion worries are premature.

To all: "Under circumstances such as these, excess coverage is triggered when the underlying policy limit is reached by the total costs incurred by the insured, *regardless* of whether the total payments to the insured by the underlying insurers reach those limits."[237] Indeed, Delaware courts have embraced "the *Stargatt* Rule that excess policies attach *irrespective* of whether the insured collected the full amount of the primary policies, so long as the excess insurer [is] only called upon to pay such portion of the loss as [is] in excess of the limits of those policies."[238] That Rule applies with unabated force in "construing a settlement in satisfaction of a policy as an exhaustion of that policy[.]"[239] And it still applies "in the face of an explicitly contrary" term or position absent a risk of "additional exposure or prejudice on the excess carrier above [its] attachment point."[240] That risk not being present or asserted here, the Insurers lack a commercially reasonable basis for requesting summary judgment on exhaustion before liability is determined. Elementary is the observation that "the excess insurer's liability begins only at its

---

[237] *Pfizer Inc. v. U.S. Specialty Ins. Co.*, 2020 WL 5088075, at *3 (Del. Super. Ct. Aug. 28, 2020) (emphasis added) (internal quotation marks and citations omitted).

[238] *Id.* (emphasis added); *see Stargatt v. Fid. & Cas. Co. of N.Y.*, 67 F.R.D. 689, 691 (D. Del. 1975).

[239] *Pfizer*, 2020 WL 5088075, at *3 (citations omitted).

[240] *Id.* at *4 (citations omitted).

own attachment point."[241] And there is no serious threat that the excess layers will be jeopardized by extra-contractual attachment when this litigation concludes.

By consequence, "a requirement to allocate insurance liability before a triggering claim has been finally decided [would cause] more, rather than less, uncertainty about ultimate proportionate liability for insurance coverage between two or more insurance companies."[242] Where, as here, not every Loss or Defense Cost has been situated as a matter of law, the Court refuses to imperil proper reimbursement by fixing an allocation scheme that might frustrate party-preferred liability arrangements.[243] To be sure, picayune battles over arithmetic that could well be tabulated early are suboptimal. But summary judgment can't be granted "where it seems prudent to make a more thorough inquiry into the facts."[244] As the Court has previously recognized, an intricate case like this one commands a

---

[241] *Id.* (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005)).

[242] *HLTH Corp. v. Agric. Excess & Surplus Ins. Co.*, 2008 WL 3413327, at *12 (Del. Super. Ct. July 31, 2008).

[243] *See Arch Ins. Co. v. Murdock*, 2020 WL 1865752, at *8-9 (Del. Super. Ct. Jan. 17, 2020); *see also Legion*, 2020 WL 5757341, at *10 ("The Court's determination that the Defense Costs incurred . . . constitute a 'Loss' does not mean that issues regarding allocation also have been determined." (citation omitted)); *Gallup*, 2015 WL 1201518, at *7, *13-14 (accepting defendant's argument that allocation is a "factually intense inquiry" and denying plaintiff's dispositive motion as a matter of law on that basis).

[244] *IDT Corp.*, 2019 WL 413692, at *5 (citing *Ebersole*, 180 A.2d at 470-72).

comparably thorough inquiry.[245]  Accordingly, as a matter of prudence and judicial caution, summary judgment on allocation and exhaustion is denied.

## IV. CONCLUSION

For the foregoing reasons:

1. Northrop's Rule 12(c) Motion is **GRANTED**;

2. Northrop's Rule 56 Motion is **GRANTED**;

3. The OATK Insurers' Rule 56 Motion is **DENIED**;

4. The Orbital Sciences Insurers' Rule 56 Motion is **GRANTED in part** (*i.e.*, with respect to the 10(b) Claim's coverage) and **DENIED in part** (*i.e.*, in all other respects); and

5. The Alliant Insurers' Rule 56 Motions are **GRANTED in part** (*i.e.*, with respect to the 10(b) Claim's coverage) and **DENIED in part** (*i.e.*, in all other respects).

**IT IS SO ORDERED.**

_____
**Paul R. Wallace, Judge**

---

[245] *See* Transcript of Hearing on Discovery Dispute at 32 (D.I. 448) ("[The Court:] Allocation really ends up being an issue after legal analysis.  And it does in particularly a complex circumstance like this depend on who[] it may be in the end . . . is on the hook from the various towers. . . .").